**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

| | |
|---|---|
| **ROBERT SALLEY and BONITA CUNNINGHAM** | **PLAINTIFFS** |
| **V.** | **NO: 3:18CV66-M-V** |
| **WEBSTER COUNTY, MISSISSIPPI; SHERIFF TIM MITCHELL, in his official capacity; CHIEF DEPUTY DILLON CATES, in his individual and official capacities; and BLAKE LOVE, in his individual and official capacities** | **DEFENDANTS** |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This cause comes before the Court on Defendants' motion for summary judgment [74]. The Court, having considered the memoranda and submissions of the parties, along with relevant case law and evidence, is now prepared to rule.

**Factual Background**

On March 3, 2018, Robert Salley and Bonita Cunningham ("Plaintiffs") were traveling to Mantee, Mississippi in Webster County to visit Ms. Cunningham's sister. During their travels, the pair were approaching a police roadblock, and instead of proceeding through it, decided to turn around in a vacant hunting camp driveway and drive in the opposite direction. Having noticed the Plaintiffs' avoidance of the roadblock, and possess of a curious disposition, Chief Deputy Dillon Cates of the Webster County Sheriff's Office attempted to initiate a traffic stop using his flashing blue lights and siren. However, the Plaintiffs did not stop their car. Salley, in a later statement to the Mississippi Bureau of Investigation ("MBI"), admitted that he knew Deputy Cates was attempting to pull him over, but that he was scared, based on "prior incidents with the Webster

County police," and decided to "speed" and drive to his home. The Plaintiffs did not call dispatch to notify the police that they would like to proceed to a public location with others present to effectuate the stop. Instead, the Plaintiffs led the police on a chase through three counties while reaching speeds in excess of 100 miles per hour, frequently traveling in the wrong lane of travel to pass motorists, and running stop signs, among other illegal and dangerous actions.

At some point in Webster County, Deputy Blake Love joined the chase with his blue lights flashing and sirens on. Despite Deputy Cates rear-ending Salley in an attempt to end the chase; despite one attempt to use a police maneuver called "boxing him in"; and despite Salley nearly hitting a white pickup truck at a high rate of speed, the pursuit continued.

Late in the chase in Grenada County, the Plaintiffs overshot a turn, and their car came to rest in a grass "ditch" on the shoulder of the road. This provided pursuing deputies Cates and Love the opportunity to exit their police vehicles and approach the Plaintiffs' car in yet another attempt to end the chase. The Plaintiffs were repeatedly told to show their hands and to exit the vehicle. Nonetheless, Salley re-started his car, turned the wheel to return to the roadway, and "hit the gas" causing the car to leap back onto the roadway in the direction of Deputy Cates. As a result of Salley reinitiating the chase, the deputies fired multiple shots into the suspect's vehicle. Despite being wounded by multiple gunshots, and having the rear driver's side tire shot flat, the Plaintiffs continued their journey until the Plaintiffs arrived at Salley's mother's house in Gore Springs, Mississippi.

Cunningham, the passenger in the car for the entire pursuit, willingly presented herself to the police for apprehension. Salley did not. He ran through the house, out the back door and crawled underneath a truck on the property – continuing his pattern of defying the orders of law

enforcement officers. It was only later that Salley came out from under the truck to be arrested by the officers on scene, although it is unclear how long this took or how it was effected. Twelve days after the police chase, the Plaintiffs filed this suit.

The Court feels it is necessary to address on the record its finding herein that the allegations maintained by the Plaintiffs in their Complaint, and in their responses to the Motions to Dismiss filed earlier in this case that the police released a police dog on Salley, and that the police allowed a "K-9" to "attack Salley," are false misrepresentations. Additionally, Plaintiffs' Counsel has made no attempt to correct the false statements perpetuated in their filings surrounding this police conduct, which directly conflict his own clients' statements to the MBI and which directly conflict their testimony in their depositions. These misrepresentations and the ongoing failure to correct the record by Plaintiffs' Counsel are reprehensible and border on blatant attorney misconduct.

**Procedural History**

In April 2018 several Motions to Dismiss were filed by the Defendants. On February 21, 2019 this Court ruled on the Motions, (1) instructing the Defendants to reassert qualified immunity by way of summary judgment once limited discovery on the issue had been conducted, (2) dismissing all state law claims against the County and its deputies in the official capacities for failing to satisfy notice requirements of the Mississippi Tort Claims Act, (3) instructing the Defendants to reassert immunity claims under Mississippi law pursuant to §11-46-7(2) and §11-46-9(c) in a motion for summary judgment, and (4) denying the motion to dismiss via abstention.

By the Court's review, the following Counts from the Plaintiffs' complaint remain:

3

I. **Federal Claims**

    A.    Count 2: All Defendants; Violation of 42 U.S.C. §1983 by (1) making an unreasonable search and seizure without due process, (2) by conspiring to deny the Plaintiffs equal protections, and (3) by refusing the Plaintiffs Fourth, Fifth, and Fourteenth Amendment protections.

    B.    Count 3: All Defendants; Violation of 42 U.S.C. §1983 by failing to instruct, supervise and control officers from unlawfully and maliciously arresting the Plaintiffs.

    C.    Count 7: All Defendants; Deprived Plaintiffs of their Fourth Amendment protection against excessive force.

    D.    Count 9: All Defendants; Violated the Plaintiffs of due process, equal protection, and their civil rights under 28 U.S.C. §1983 and 42 U.S.C. §1343.

II. **State Claims**

    A.    Count 4: Cates and Love Individually only; Negligent and/or grossly negligent hiring, monitoring, training and supervision.

    B.    Count 5: Cates and Love Individually only; Negligent and/or Intentional infliction of emotional distress.

    C.    Count 6: Cates and Love Individually only; Civil Assault and Battery

    D.    Count 8: Cates and Love Individually only; Reckless disregard for the safety and wellbeing of the Plaintiffs.

    E.    Count 10: Love Individually only; Bystander liability.

**Discussion**

I. **Standard for Summary Judgment**

Under Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Further, the Supreme Court has stated "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . ." *Id.* at 323. "Once a summary judgment motion is made and properly supported, the nonmovant must go

4

beyond pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the nonmovant's burden." *Wallace v. Texas Tech University,* 80 F.3d 1042, 1047 (5th Cir. 1996). "Specifically, a non-moving party cannot defeat summary judgment by relying only on its pleadings. *Id.* at 325.

## II.     Qualified Immunity for Federal Claims

"The doctrine of qualified immunity provides protection against suit to government officials unless their conduct violates a clearly established constitutional right." *Ougel v. Amite City Police Dept.,* 352 Fed. Appx. 941, 943 (5th Cir. 2009); citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Law enforcement officers, "like other public officials acting within the scope of their official duties, are shielded from claims of civil liability, including §1983 claims, by qualified immunity." *Morris v. Dillard Dept. Stores, Inc.,* 277 F.3d 743, 753 (5th Cir. 2001). However, a two-step test must be applied to determine whether a police officer is entitled to qualified immunity. *Ougel v. Amite City Police Dept.,* 352 Fed. Appx. 941, 943 (5th Cir. 2009). "First, the plaintiff must show that he suffered a constitutional violation, and then we must determine whether the action causing the violation was objectively unreasonable in light of clearly established law at the time of the conduct." *Id.;* citing *Freeman v. Gore,* 483 F.3d 404, 410 (5th Cir. 2007).

The Plaintiffs allege that constitutional violations arise out of the Fourth Amendment, the Fifth Amendment, and the Fourteenth Amendment.

    A.     <u>Fourth Amendment</u>

        1.     Unreasonable Arrest /Search and Seizure

To establish that the defendants violated Plaintiffs' constitutional rights by arresting them

5

and/or searching and seizing their car, the plaintiffs must show that the officers lacked probable cause. *Deville v. Marcantel,* 567 F.3d 156, 164 (5th Cir. 2009). Law enforcement officers "may briefly detain suspects for investigative purposes if they have a reasonable suspicion, grounded in specific and articulable facts, that criminal activity is afoot." *Goodson v. City of Corpus Christi,* 202 F.3d 730, "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.*

Here, the undisputed facts show that the officers first attempted to detain Plaintiffs after they seemingly evaded a police checkpoint by turning around in a vacant driveway. Based on the facts available to the officer at the moment of attempted arrest, the Court finds that there were sufficient facts for a reasonable person or officer to conclude that the suspect had committed or was committing an offense. As such, Plaintiffs' have failed to demonstrate that a genuine issue of fact exists to overcome the qualified immunity defense as it applies to claims regarding an unreasonable arrest/search and seizure under the Fourth Amendment.

    2.    Excessive Force

To prevail on a claim that there is no qualified immunity under the Fourth Amendment allegations excessive force allegations, the Plaintiffs "must show that the excessive force was objectively unreasonable under the totality of the circumstances." *Ougel v. Amite City Police Dept.,* 352 Fed. Appx. 941, 943 (5th Cir. 2009); citing *Tennessee v. Garner,* 471 U.S. 1, 11 (1985). "The use of deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Romero v. City of Grapevine,* 888 F.3d 170, 176 (5th Cir. 2018). And that the probable cause is

6

determined from the lens of "a reasonable officer on the scene, paying careful attention to the facts and circumstances of each particular case." *Escobar v. Montee,* 895 F.3d 387, 394 (5th Cir. 2018).

In *Scott v. Harris,* another case involving a high-speed chase, where multiple cops with lights and sirens chased the respondent for over 10 miles; the Supreme Court reasoned that:

> it [is] appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was the respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless high-speed flight that ultimately produced a choice of two evils that [the officer] confronted. . . he ignored their warning to stop. By contrast, those who might have been harmed had [the officer] not taken the action he did were entirely innocent.

550 U.S. 372, 383-384 (2007). In short, the Supreme Court held that the deputy acted reasonably when he used deadly force to terminate a car chase, and thus did not violate the fleeing suspect's Fourth Amendment rights. *Id.*

The record in this case reflects that Salley turned the car around in a vacant driveway to avoid a checkpoint[1], saw a police cruiser behind him with flashing lights and sirens on, pulled over with the assumption that the police cruiser wanted to pass him, but then then initiated a police chase when the deputy also pulled over indicating that Salley's car was the subject of the lights and sirens. The plaintiffs were speeding – reaching speeds near 100 miles per hour— weaving in and out of traffic, passing other innocent motorists over a double yellow line, driving in the wrong direction in a lane of travel, ignoring traffic control devices like stop signs, and nearly hit at least

---

1 The Plaintiffs maintain that the u-turn was only effected because they "realized they were lost;" however, the Court finds this assertion by Plaintiffs' Counsel to be in direct conflict with the testimony given by Ms. Cunningham to the MBI that the blue lights of the police cruisers were visible before they turned around. Nonetheless, the Plaintiffs' intentions and reasoning for turning around have no impact on this analysis because the determination of probable cause for a police stop is viewed from the knowledge and information available to the police officer at the time of the incident and does not take into consideration the suspect's state of mind.

7

one other car at a high rate of speed. The deputies used other police tactics to attempt to end the chase, such as rear-ending (also called "controlled contact") the plaintiffs' car, and a discussion was had about attempting to "box" the Plaintiffs' car in. Then, the Plaintiffs' overshot a turn and found their car stuck in a grass "ditch" on the shoulder of the road with the engine off.

Believing that Salley's car was stopped in the ditch, the two officers in pursuit got out of their police cruisers and approached the car. The deputies directed the Plaintiffs to "put their hands up" and to "get out of the car." Instead of following the lawful orders of the police, Salley, according to the statement he made to the MBI, made the conscious choice to "restart" his car, turn the wheel to the left to get back onto the roadway, and "hit the gas" towards an officer who was standing in the road on the driver's side of Salley's car. It was only then, after the Plaintiffs **reinitiated** the pursuit, knowing the dangerous actions taken by Salley up until that point, that the officers discharged their weapons. All in all, the pursuit in this case lasted over 20 miles and weaved through three counties putting countless motorists and pedestrians at risk – far longer than the chase in *Scott* discussed above.

Looking at the body of facts on the record, at the very least the Plaintiffs posed a "threat of serious harm" to any person who happened to be traveling on the county roads at the same time of the police chase. Salley admitted as much in his interview with the MBI. [74 ex.4]. Salley knowingly made the decision to ignore stop signs, cross over double yellow lines to pass other cars, and to reach speeds of 100 miles per hour — all placing innocent motorists at risk. Additionally, the deputies took several steps provided for in the Webster County Sherriff Office's Pursuit Policies to end the pursuit before resorting to deadly force. As such, the Court has little difficulty in concluding that it was reasonable for the police to use deadly force in an attempt to

8

end the chase before innocent pedestrians or motorists were harmed by the Plaintiffs' reckless actions. Plaintiffs have failed to demonstrate that a genuine issue of fact exists as to a constitutional violation to overcome the qualified immunity defense as it applies to claims regarding excessive force under the Fourth Amendment.

B.  Fifth Amendment

Plaintiffs' Fifth Amendment claims are alleged in Count 2 of the Complaint, in which the Plaintiffs allege "[a]cting under the color of law, Defendants worked to deny Plaintiffs' rights, privileges, or immunities secured by the United States Constitution or by the Federal Law . . . [b]y refusing or neglecting to prevent such deprivations and denials to Plaintiffs, thereby depriving Plaintiffs of their rights, privileges, and immunities as guaranteed by the Fifth . . . Amendment[] of the United States Constitution." [1]

The Fifth Circuit has made abundantly clear that violations of the Fifth Amendment right to due process only "pertain[] to federal, not state, actors." *Coleman v. Sellars,* 614 Fed.Appx. 687, 689 (5th Cir. 2015).

The Defendants argue that they are entitled to summary judgment because no federal actor is present. The Plaintiffs failed to respond to the Defendants' arguments, or to provide any caselaw or analysis to the contrary. Because the only defendants in this case are a County of the State of Mississippi, a Sheriff in his official capacity serving the state, and two state police deputies; and because there are no allegations that any of the named Defendants are federal actors; the Court finds that no constitutional violation of the Plaintiffs' Fifth Amendment rights has occurred. The Plaintiffs' have failed to demonstrate that a genuine issue of fact exists to overcome the qualified immunity defense as it applies to claims regarding the Fifth Amendment.

C.     Fourteenth Amendment

"Section 1983 complaints must embrace more than a generic, amorphous claim of due process violations." *Dismukes v. Hackathorn,* 802 F.Supp. 1442, 1445 (N.D. Miss. 1992). "Vague, nebulous due process claims are too broad, given the complexities inherent in the due process clause of the Fourteenth Amendment, from which three distinct constitutional protections originate." *Id.*

Plaintiffs' §1983 claims of due process violations as pled are exactly what this Court discussed in *Dismukes*. The Complaint contains no specific allegations as to what due process violations allegedly occurred. The Defendants' motion for summary judgment argues in detail that a due process theory is not sustainable by the Plaintiffs here. In response, the Plaintiffs provide only a conclusory statement that "genuine issues of material fact exists (sic) as to whether a deputy firing his weapon and injuring two non-violent citizens when no prior action was taken to stop the pursuit is conduct that is shocking to the conscious." [88 pg. 7]. Facially, the Plaintiffs fail to point to any evidence on the record in support of their claim. In fact, the record evidence – including testimony from the Plaintiffs themselves – indicate that the deputies rear ended the Plaintiffs in an attempt to end the chase, and that when the car skidded off the road into a ditch that the police surrounded the Plaintiffs' car on two sides ordering them to exit the vehicle. The facts clearly show that the deputies only discharged their weapons <u>after</u> the deputies' other efforts to end the chase failed and the Plaintiffs re-initiated the car chase.

The Supreme Court has emphasized that "[t]he touchstone of due process is protection of the individual against <u>arbitrary</u> action of government." *County of Sacramento v. Lewis,* 523 U.S. 833, 845 (1998)(emphasis added). Even if the Court were to ignore the record evidence before it

10

and accept the Plaintiffs' unsupported conclusory assertions at face value, caselaw clearly indicates that "[i]n the context of police chases, 'causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender,' does not shock the conscience." *Williams v. Anderson,* 2019 WL 138744, *4 (N.D. Miss. 2019); citing *Scott v. Harris,* 550 U.S. 372, 386 (2007).

The Plaintiffs have failed to provide any specific claims or factual support to their due process violation theory. Thus, they have failed to overcome the qualified immunity defense as it applies to the due process claims raised in the Complaint.

        D.        <u>Equal Protection Claims</u>

It is clearly established that intentional discrimination violates the law. However, the Plaintiffs must factually support the allegation of intentional bias to defeat a qualified immunity defense. *State and Local Government Civil Rights Liability* §2:11 Qualified Immunity – Equal Protection Claims.

The Defendants have alleged that there are no race issues present in this case; and that both officers who are defendants in this case were extensively deposed on race issues and have undergone training regarding the importance of equal protection laws. The Defendants also noted that neither officer has a record of any race issues on their record.

In response, the Plaintiffs were entirely silent, failing to refute the Defendants' arguments that there is no equal protection issue implicated here and also failing to point to even a shred of evidence to keep this claim alive.

The Court finds that the equal protection claims are factually unsupported. Therefore they must be dismissed.

11

E.  28 U.S.C. §1343

Section 1343 is widely viewed as the Federal Civil Rights Act. However, this section is only applicable to "persons" and as such cannot be maintained against the County.

The Defendants have alleged that the Plaintiffs have not met their burden of showing any conspiracy existed to deprive the plaintiffs of equal protection of the law. The Plaintiffs responded that the Plaintiff's claims of a previous incident with the Webster County Sheriff's Department coupled with the pursuit and subsequent officer shooting at issue in this case, is sufficient to carry their burden that a conspiracy existed. However, the Plaintiffs have offered no documentary or record evidence to demonstrate what happened during the alleged prior incident with Webster County, that the Deputies knew the identity of the Plaintiffs prior to initiating the stop, or that a conspiracy of any kind existed.

Again, a non-moving party cannot defeat summary judgment by relying on only its pleadings. The Plaintiffs' have failed to designate 'specific facts showing that there is a genuine issue for trial' and as such, Plaintiffs' claims under §1343, and all other conspiracy related claims must be dismissed.

Overarchingly, the Plaintiffs have failed to support any of their allegations with factual support; Plaintiffs seem hang their hat on their opinion that any discharge of a weapon by a police officer is by definition "unreasonable conduct by a police officer." The law is not on their side in that regard. The Plaintiffs have wholly failed to demonstrate any constitutional violation, which is the first prong in a qualified immunity analysis. As such, all federal law claims against Sheriff Tim Mitchell, Chief Deputy Dillon Cates, in his individual and official capacities, and Deputy Blake Love, in his individual and official capacities are hereby dismissed with prejudice.

**III.     Municipal Liability for Federal Claims**

This Court now turns to the Plaintiffs' federal claims against Webster County, Mississippi. It should be clear that this Court has already concluded that no constitutional violation was committed by either of the deputy defendant actors in this case, which necessarily precludes liability against the County in the same regard. It is well established that "[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing." *Doe ex rel., Magee v. Covington County School Dist. Ex rel. Magee,* 675 F.3d 849, 867 (5th Cir. 2012). However, even if a constitutional violation by an officer should somehow be proven, for the County to be held liable, the Plaintiffs would still face the burden of proving that the violation was made in accordance with an official municipal policy or custom. *See Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694 (1978).

In their motion, Defendants produced a copy of the County's policies; deposition testimony from both the Plaintiffs and Defendants indicating the deputies attempted and/or considered several other methods to stop the car chase; compliance with state training standards for deputies; and clear disciplinary records for the deputies involved.

While Plaintiffs' response provided a comprehensive overview on the law of the land surrounding municipal liability, they relied on assertions like "Deputy Cates shot at Plaintiffs' vehicle without first using any other tactics such as road spikes to stop the vehicle. This policy mandates that Webster County deputies essentially shoot first and ask questions later." [Plaintiffs' Brief at *13]. Plaintiffs wholly fail to dispute the clearly established fact that the deputies rear-ended the Plaintiffs at least once (listed as "controlled contact" in the Webster County Sheriff Department Vehicular Pursuit Policies), that they discussed trying to "box  the plaintiffs in"

13

(another listed technique in the Vehicular Pursuit Policies) and that it was only <u>after</u> the Plaintiffs ignored commands to exit the car and <u>reinitiated</u> the chase that the deputies fired their weapons. In addition, we are still only discussing a singular instance – a policy or custom by definition is something that is happening so widespread and commonly that it fairly represents a municipal policy. *McGregory v. City of Jackson,* 335 Fed. App'x 446, 448-9 (5th Cir. 2009). The Plaintiffs use of "policy" in the previously quoted statement is obviously being used as a colloquialism and not as the term of art defined by the law.

The Plaintiffs have not carried their burden to demonstrate that there was a constitutional violation in accordance with an official municipal policy or custom. Therefore, Webster County, Mississippi is entitled dismissal of all federal claims brought against it.

## IV. State Law Claims

Having dismissed all of Plaintiffs' federal claims, this court must now decide whether it should retain jurisdiction over their remaining state law claims against the police officers in their individual capacities.[2]

Mississippi Code Annotated §11-46-7(2) states "no [government] employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties. For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment . . . if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense."

First, there are no allegations that the officers were outside of their course and scope of

---

[2] All state law claims against the County, and the Deputies in their official capacities were dismissed at the Motion to Dismiss phase of the case. [21].

14

employment at the time of the high speed car chase- there is no evidence showing they were off duty, etc. There also is no evidence on the record that the deputies involved in this high speed car chase knew the identities of the Plaintiffs at any time during the first phase of the car chase before the Plaintiffs car ended up in the grass ditch. Finally, there is no evidence that the police pursued the Plaintiffs out of malice, because as fully analyzed earlier, the deputies had probable cause to initiate a traffic stop of the Plaintiffs. It is not the Court's burden to prove the Plaintiffs case, and with no evidence placed before it, the Court finds that the deputies were both within their course and scope of employment and their conduct did not constitute fraud, malice, libel, slander, defamation or any other criminal offense. As such, immunity as provided for in Miss. Code Ann. §11-46-7(2) applies in this case barring the state claims raised in this suit against both Chief Deputy Dillon Cates in his individual capacity, and Deputy Blake Love in his individual capacity.

**IT IS HEREBY ORDERED** that [74] Defendants' motion for summary judgment is **GRANTED.**

This the 16th day of March, 2020.

/s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**

15